1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JERINA LOUISE TRAISTER,              Case No. EDCV 12-1662-SS

12                  Plaintiff,

13       v.                             **MEMORANDUM DECISION AND ORDER**

14  CAROLYN W. COLVIN,
    Commissioner of the Social
15  Security Administration,

16                  Defendant.

17

18                            **I.**

19                      **INTRODUCTION**

20

21       Jerina Louise Traister ("Plaintiff") seeks review of the

22  final decision of the Commissioner of the Social Security

23  Administration (the "Commissioner" or the "Agency") denying her

24  Supplemental Security Income ("SSI") benefits.    The parties

25  consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of

26  the undersigned United States Magistrate Judge.    For the reasons

27  stated below, the decision of the Commissioner is AFFIRMED and

28  the above-captioned action is dismissed with prejudice.

**II.**

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI benefits on April 11, 2006.  (Administrative Record ("AR") 608).  Plaintiff originally alleged a disability onset date of April 1, 1994, then later alleged an onset date of April 1, 2003.  (AR 608, 94).  The Agency denied Plaintiff's application on August 15, 2006, (AR 42-45), and again, upon reconsideration, on April 26, 2007. (AR 52-57).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on May 31, 2007.  (AR 58).  Plaintiff testified at a hearing held before ALJ F. Keith Varni on July 2, 2008.  (AR 26, 494).  On August 12, 2008, ALJ Varni issued a decision denying Plaintiff SSI benefits.  (AR 5-16).  Plaintiff then requested review of the ALJ's decision on August 19, 2008.  (AR 4).  The Appeals Council denied Plaintiff's request for review on May 14, 2009.  (AR 1-3).  Plaintiff sought review of the ALJ's decision in Traister v. Astrue, EDCV 09-01082-SS, and on April 13, 2010, this Court remanded Plaintiff's case for further administrative proceedings.  (AR 542-52).

On July 30, 2010, the Appeals Council sent Plaintiff's case to ALJ Jesse Pease.  (AR 503, 553-55, 799).  Plaintiff testified at a hearing before ALJ Pease on March 17, 2011.  (AR 503-25, 799-819).  Thereafter, ALJ Pease issued a decision on April 7, 2011 denying Plaintiff SSI benefits.  (AR 556-66).  Plaintiff sought review of ALJ Pease's decision in Traister v. Astrue, EDCV 11-00954-SS, and on January 9, 2012, this Court remanded the case

2

1  for further proceedings consistent with the parties' stipulation

2  for voluntary remand.  (AR 846-47).

3

4      On February 7, 2012, the Appeals Council returned the case

5  to ALJ Pease.  (AR 820, 848-52).  Plaintiff testified at a

6  hearing before ALJ Pease on June 29, 2012.  (AR 820-42).  ALJ

7  Pease issued another decision unfavorable to Plaintiff on August

8  3, 2012.  (AR 751-65).  Plaintiff filed the instant action on

9  November 2, 2012.

10

11                          **III.**

12                   **FACTUAL BACKGROUND**

13

14      Plaintiff was born on November 7, 1967 and was thirty-eight

15  years old when she applied for SSI benefits.  (AR 94, 608).

16  Plaintiff last worked in 2004 when she attempted to start her own

17  business.  (AR 30, 803).  Prior to 2004, Plaintiff worked at

18  Long's Drug Store (October 1999 to March 2000), Wherehouse

19  Entertainment, Inc. (November 1996 to October 1999), and Trimont

20  Land Company, a ski resort (three months in 1994).  (AR 117-24).

21  Plaintiff claims she suffers severe pain in her lower back, head

22  and neck, migraine headaches, depression, and has severe

23  temporomandibular joint syndrome ("TMJ").  (AR 793, 804).

24  Plaintiff alleges that she stopped working and cannot engage in

25  substantial gainful activity due to her pain, migraines and

26  psychological ailments.  (AR 99).

27  \\

28  \\

                              3

Plaintiff visits a doctor at least once per month and is currently taking several different medications for her various physical and mental health issues. (AR 749-50, 808).

**A.   First Administrative Hearing (July 2, 2008)**

At her July 2, 2008 administrative hearing, Plaintiff testified that she suffered from pain in her head, neck and lower back. (AR 793). Her lower back pain started around 1986, when she was nineteen years old. (Id.). Plaintiff was able to handle the pain until "about 2004 [when] it started getting really bad." (Id.). Plaintiff explained that she also experienced migraine headaches and received epidural injections in her head once every three months for treatment. (AR 793-94). Because of her pain and migraines, Plaintiff experienced difficulty concentrating and felt depressed. (Id.). She testified that she struggled with anxiety as well, and that she previously attempted suicide "approximately seven or eight times." (AR 794).

When asked about her typical day, Plaintiff responded, "I have to rest quite a bit because when – if I move too much, the pain gets so bad." (AR 796). Plaintiff stated that she performed minimal housework and seldom ventured outside to shop. (Id.).

\\
\\
\\
\\

**B.**   <u>**Second Administrative Hearing (March 17, 2011)**</u>

    **1.**   **Plaintiff's Testimony**

At her March 17, 2011 administrative hearing, Plaintiff testified that she had not worked since applying for SSI benefits.  (AR 803).  Between December 2010 and March 2011, Plaintiff experienced "[m]igraine headaches, depression, [and] TMJ – severe TMJ."  (AR 804).  Her TMJ was mainly on her left side, but it was "moving over to [her] right side."  (<u>Id.</u>). According to Plaintiff, she had degenerative disc disease in her "cervical and also [her] lumbar . . . which cause[d] immense pain.  It g[ot] so bad to where [she] end[ed] up shaking from the pain."  (<u>Id.</u>).  Plaintiff also testified that, contrary to her disability report, she did not suffer from multiple personality disorder.  (AR 99, 804-05).  However, Plaintiff admitted that she received counseling and took medicine to treat her depression. (AR 807).

After 2006, Plaintiff's migraine headaches, depression, back pain and TMJ all grew more severe.  (AR 805-06).  Plaintiff testified that she started to use a cane to walk in 2010.  (AR 808).  Plaintiff explained that she could shower only twice a week because "it hurt[] so much to stand up."  (AR 809).  She could sit only for "30 minutes maximum . . . before it start[ed] to hurt really bad."  (<u>Id.</u>).  She could stand still for approximately fifteen minutes at a time.  (AR 810).  Plaintiff could not walk a single block on an uneven surface, even at a

5

1    reasonable pace, because of her back pain.  (Id.).  She could
2    climb stairs only if she held onto the rail and pulled herself
3    up.  (Id.).  Plaintiff also "stiffen[ed] up" in the cold and the
4    heat.  (AR 810-11).  Finally, she could not focus for long
5    periods of time.  (AR 811).

6

7       **2.   Vocational Expert's Testimony**

8

9       Vocational Expert Corrine Porter testified at Plaintiff's
10   March 17, 2011 hearing.  (AR 812).  The ALJ gave Ms. Porter a
11   hypothetical.  (AR 817).  The ALJ posited an individual limited
12   to light work with "occasional postural activities," very
13   occasional talking, "use of a cane would be required if out of
14   the immediate work area and the work would be in a nonpublic
15   environment."  (Id.).  Ms. Porter concluded that an individual
16   with the posited limitations could not perform any of Plaintiff's
17   past work, and no skills would transfer.  (Id.).  However, Ms.
18   Porter concluded that such an individual could perform light
19   level work as a sewing machine operator, garment sorter, or
20   electronics worker. (AR 817-18).

21

22      Plaintiff's attorney asked Ms. Porter whether an individual
23   with the added restriction of needing to take "two unscheduled
24   breaks of ten minutes each workday due to side effects from
25   psychotropic medication and pain[]" would be able to perform the
26   light level worked described above.  (AR 818).  Ms. Porter
27   responded that "[i]f the individual needed to take two extra
28   \\

breaks a day – even at 20 minutes a day, the individual would not be working at a competitive rate over time." (Id.).

**C.   Third Administrative Hearing (June 29, 2012)**

    **1.   Plaintiff's Testimony**

    At her June 29, 2012 hearing, Plaintiff testified that her conditioned deteriorated after her March 17, 2011 hearing. (AR 824). Specifically, she "start[ed] to have symptoms in [her] upper back." (Id.). According to Plaintiff, her jaw pain grew so severe and constant that she could "barely even chew rice" and could only eat soft foods, such as baby food. (AR 825, 828).

    Plaintiff claimed that she was experiencing harmful side effects from her numerous medications. (AR 827). Her medications were purportedly interfering with her concentration and memory, and also making her tired. (Id.). Plaintiff explained that on average, she required three to four naps per day, each lasting "anywhere from half an hour to an hour and-a-half." (Id.).

    **2.   Vocational Expert's Testimony**

    Vocational Expert Aida Worthington testified at Plaintiff's June 29, 2012 hearing. (AR 830). The ALJ gave Ms. Worthington two hypotheticals. (AR 832). In the first hypothetical, the ALJ posited an individual limited to light work with occasional

postural activities and very occasional talking, who required use of a cane for movement outside the immediate work area, and the work would be in a non-public environment. (AR 832-33). Ms. Worthington concluded that an individual with these limitations could not perform any of Plaintiff's past work. (AR 833). The ALJ asked if there are any jobs for an individual with the hypothetical limitations that require unskilled, light or sedentary work. (AR 834). Ms. Worthington responded, "Yes, Your Honor, and one of them would be that of an addresser." (AR 835). The ALJ then asked Ms. Worthington if an individual with the hypothetical limitations could work as a garment sorter, electronics worker, or sewing machine operator. (AR 838-39). Ms. Worthington responded that such an individual could perform those jobs. (AR 839).

Second, the ALJ posited the same hypothetical as above, but added that "the individual would need to take naps three to four times a day for 30 to 90 minutes each." (AR 841). Ms. Worthington concluded that an individual with this additional limitation would not be able to find any work. (Id.).

### 3.   Steven Beckman's Testimony

Steven Beckman, Plaintiff's boyfriend, testified at the June 29, 2012 hearing before the ALJ. (AR 829). Mr. Beckman testified that he had known Plaintiff since about 2000 or 2001. (Id.). Mr. Beckman claimed that after meeting Plaintiff, her health "[d]efinitely got[] worse." (Id.). For example, he

witnessed Plaintiff "go from walking normally to [using] a cane[,] and observed her struggle with severe pain and fatigue. (Id.).    Mr. Beckman testified that he assisted Plaintiff on a daily basis with housework and other daily activities – for example, he helped Plaintiff enter and exit her vehicle.  (AR 830).   Mr. Beckman occasionally cooked for Plaintiff when she experienced too much pain to prepare her own meals.  (Id.).   He testified that "[s]ome days [Plaintiff] ha[d] little better days. Some days she naps and naps and can't hardly [sic] get around." (Id.).

**D.   Plaintiff's Function Reports**

    **1.   First Function Report (May 18, 2006)**

On May 18, 2006, Plaintiff completed an adult function report. (AR 108-15). Plaintiff indicated that on a typical day, she "roll[ed] [her]self out of bed – shower[ed], [ate], read, listen[ed] to music, rest[ed], rest[ed], watch[ed] TV, rest[ed]." (AR 108).  Plaintiff's pain often interrupted her sleep.  (AR 109).  Though she was able to feed her cat and clean its litter box, (id.), Plaintiff could only sometimes prepare her own meals. (AR 110).  Plaintiff cleaned around the house whenever she could, but often required assistance.  (Id.).  Plaintiff's ability to engage in other physical activity was extremely limited because of her pain.  (AR 112).  Her alleged ailments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and concentrate.  (Id.).  As a

result, she could walk only about 200-300 yards before needing to rest.  (Id.).

Plaintiff's social activities generally consisted of talking to and watching movies with others.  (AR 112).  She did not interact with many people "on a friendship basis because [she] fe[lt] they w[ould] be to [sic] judgmental of [her]" and that they might take advantage of her weaknesses.  (Id.).

Plaintiff indicated that she could not handle stress well and tended to "short circuit."  (AR 114).  She noted that simply completing the function report was "very stressful."  (Id.). Changes in Plaintiff's routine "overwhelm[ed] [her] at times[,]" and she allegedly heard voices in her head that "someone is going to kill [her]."  (Id.).

**2.   Second Function Report (March 13, 2007)**

On March 13, 2007, Plaintiff completed another function report.[1]  (AR 144-51).  Plaintiff indicated that her degree of pain dictated her activities on a day-to-day basis.  (AR 144). She explained that "[i]t never stop[ped] hurting[,]" and medication did not significantly alleviate her pain.  (Id.). Plaintiff claimed she could walk only 100-200 yards before needing to rest.  (AR 149).

---

[1]   This function report is very similar to Plaintiff's May 18, 2006 report.  Therefore, this section addresses only deviations from and additions to the first report.

1

2     Plaintiff stated that she attended therapy and group

3 counseling once per week. (AR 148). According to Plaintiff, she

4 suffered from "social anxiety disorder." (AR 149). Plaintiff

5 claimed that she wished she could work and was "becoming more and

6 more depressed by the pain . . . ." (AR 157). Plaintiff

7 concluded the function report by stating that "[m]ore often than

8 not [she] wish[ed] [her] life would be over with so [she]

9 wouldn't have to suffer so much anymore. [She] just wish[ed] the

10 pain would subside." (Id.).

11

12 **E.    Plaintiff's Headache Questionnaire**

13

14     Plaintiff completed a headache questionnaire on June 29,

15 2006. (AR 133-34). She indicated that her headaches began in

16 1990 and that, as of the date of the questionnaire, she

17 experienced headaches weekly (although their exact frequency

18 varied month-to-month). (AR 133). Plaintiff's headaches

19 typically lasted one to two days and resulted in severe pain,

20 nausea and vomiting. (Id.). Plaintiff experienced her headaches

21 on the left side of her head, behind her eye and in her neck.

22 (Id.). Plaintiff stated that her doctor diagnosed her with

23 migraines, but medication was not substantially helping her

24 migraine pain. (AR 133-34).

25

26

27

28

**F.    Steven Beckman's Third Party Function Reports**

    **1.    First Function Report (May 14, 2006)**

On May 14, 2006, Steven Beckman filled out a third party function report. (AR 125-32). Mr. Beckman lived with Plaintiff at the time he completed the function report. (AR 125). According to Mr. Beckman, a typical day for Plaintiff involved "shower[ing], eat[ing], [and] reads[ing.]" (Id.). He indicated that Plaintiff was not experiencing problems with personal care (i.e., grooming and bathing herself, using the bathroom on her own, etc.), and she cared for her cat without any help. (AR 126). Mr. Beckman stated that depending on Plaintiff's pain level, she could occasionally stand long enough to cook; however, when she could not prepare her own meals, Mr. Beckman would cook for her. (AR 127). Plaintiff could also occasionally do housework, such as vacuuming; other days, however, she "experienced trouble getting up [and] down the stairs." (Id.). Mr. Beckman indicated that Plaintiff was limited in her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (Id.). He also stated that Plaintiff could walk about 200 yards before needing to rest. (Id.).

In terms of cognitive ability, Plaintiff was able to "mentally handle [her] finances" but had no income. (AR 128). Her hobbies included reading and watching television, which she did "most of the time." (AR 129). Plaintiff could also talk on the telephone with others. (Id.).

12

1      **2.   Second Function Report (March 13, 2007)**

2

3      On March 13, 2007, Steven Beckman filled out a second

4  function report.[2]   (AR 152-59).   Mr. Beckman stated that in

5  addition to showering, eating and reading, Plaintiff also

6  routinely traveled to doctor appointments.   (AR 152).   Mr.

7  Beckman indicated that Plaintiff used a cane to walk.   (AR 158).

8

9      Mr. Beckman also indicated that after he filed the May 14,

10  2006 function report, Plaintiff "deteriorated."   He explained

11  that "[s]ince her last application she has had an MRI of only her

12  lumbar region of her back and the written report which will be

13  included states that she has 4 of her disks in her lower back

14  only broad base bulged."   (AR 159).

15

16  **G.   <u>Plaintiff's Medical History</u>**

17

18      On October 14, 2004, Plaintiff underwent a one hour clinical

19  assessment at the BVCHD-Family Counseling Center.   (AR 247).   Dr.

20  Lyle Forehand, Jr. noted that Plaintiff used methamphetamine in

21  the past and was experiencing anxiety because of her withdrawal

22  from the drug.   (<u>Id.</u>).   In his 2004 report, Dr. Forehand wrote

23  the following: "Depression – business is failing, is not paying

24  bills & is at risk of losing her home.   Anxiety, both internal

25  (including from absence of meth) and external . . . ."   Dr.

26

27  ―――――――――
[2]   This function report is very similar to Mr. Beckman's May

28  14, 2006 report.   Therefore, this section addresses only
   deviations from or additions to the first report.

1   Forehand noted that Plaintiff had a history of substance abuse,
2   including cocaine use.    (Id.).    Plaintiff was also drinking
3   alcohol moderately at the time of the assessment.    (Id.).

5      On November 16, 2004, Plaintiff visited the Family Health
6   Center, complaining of bilateral jaw pain, hypertension,
7   depression and anxiety.    (AR 315).    Melissa Staricka, a family
8   nurse practitioner (F.N.P.), noted that Plaintiff had
9   hypertension, TMJ and depression.    (AR 316).    On November 24,
10  2004, Plaintiff visited the Family Health Center for a follow-up.
11  (AR 312).    Ms. Staricka noted that Plaintiff's depression had
12  improved and her hypertension was under better control.    (AR
13  313).

15      On January 31, 2005, Plaintiff went to the emergency room at
16  Bear Valley Community Hospital for a concussion.    (AR 387).    Dr.
17  Christopher Fagan noted that a CT scan of Plaintiff's head came
18  back negative.    (Id.).    There was no evidence of an intracranial
19  hemorrhage, and Plaintiff was diagnosed with a closed head injury
20  with "multiple contusions to the extremities."    (AR 387-88).

22      On June 19, 2006, Plaintiff visited Arrowhead Regional
23  Medical Center for the first time.    (AR 466).    Plaintiff
24  complained of chronic back pain and "intermittent drop foot."
25  (Id.).    There was no "gross evidence of foot drop" and no
26  evidence of muscle atrophy.    (Id.).    Plaintiff received an x-ray
27  of her lumbar spine, hip and cervical spine.    (AR 468-71).    Dr.
28  Sylvia Ortiz concluded that (1) Plaintiff's lumbar spine revealed

normal alignment and disc space, (2) her bilateral hip failed to reveal any fractures, dislocation or other bone or joint abnormalities, and (3) examination of Plaintiff's cervical spine revealed normal alignment and disk spaces. "No fractures, subluxation or other bony abnormalities [were] evident." (Id.).

On July 14, 2006, Plaintiff underwent a complete psychiatric evaluation at Alto Medical Group. (AR 425-34). Dr. Linda Smith conducted the evaluation. (Id.). According to Dr. Smith, Plaintiff complained that she suffered from "'Borderline Personality Disorder. [and/or] Multiple Personality Disorder.'" (AR 425). However, Dr. Smith noted that there was no evidence that Plaintiff had a "Dissociative Identity Disorder." (AR 426). When Dr. Smith asked Plaintiff what she meant by "Multiple Personality Disorder," Plaintiff "immediately [became] vague." (Id.). "[Plaintiff] start[ed] talking in a very vague, non-informative manner about what happened, her life, whatever." (Id.). Plaintiff made a vague claim about "possibly hearing voices" and that these may be her other personalities. (AR 430-31). Dr. Smith noted there was "no evidence at all of any psychosis." (AR 431).

Plaintiff told Dr. Smith that she was previously hospitalized in a psychiatric ward and had made suicide attempts. (Id.). Plaintiff also informed Dr. Smith that she consumed "just about five drinks a day[,]" last smoked marijuana a few months earlier, but had not used cocaine or methamphetamine since September 2004. (AR 429).

15

1   Dr. Smith noted that overall, Plaintiff's speech was normal, she
2   was alert and oriented at all times, she was at least of average
3   intelligence, she was not tearful, and she was able to follow the
4   conversation well. (AR 431). Her daily activities in 2008, as
5   reported to Dr. Smith, included household chores, cooking,
6   dressing and bathing herself, going to the store and running
7   errands. Plaintiff drove herself to the appointment with Dr.
8   Smith. Her hobbies included watching TV, reading, movies and
9   listening to music. She was capable of handling her bills and
10  handling cash. According to Dr. Smith, Plaintiff reported not
11  getting along with family, but getting along well with other
12  people. (AR 430).

13

14      Dr. Smith opined that many of Plaintiff's past problems were
15  a function of her cocaine and methamphetamine use. (AR 432).
16  Plaintiff informed Dr. Smith that she still occasionally smoked
17  marijuana and Dr. Smith believed Plaintiff continued to abuse
18  alcohol, drinking five drinks a day. (AR 433). Dr. Smith noted
19  that Plaintiff's abilities to understand, remember, or complete
20  simple or complex commands were not impaired, but she was "mildly
21  impaired in her ability to interact appropriately with
22  supervisors, co-workers, or the public due to some possible
23  interference from unstable mood[.]" (Id.). Plaintiff was not,
24  however, impaired in her ability to comply with job rules, such
25  as safety rules and attendance, and she was capable of
26  maintaining persistence and pace in a normal workplace setting.
27  (AR 433).

28

On July 14, 2006, Plaintiff underwent a complete internal medicine examination at Alto Medical Group. (AR 435-441). Dr. Nicholas Lin conducted the examination. (Id.). Plaintiff complained of chronic back pain, carpal tunnel syndrome of her left hand, left-sided migraine headaches, hypertension, personality disorder and depression. (AR 435). Dr. Lin noted that Plaintiff smoked five to ten cigarettes per day and consumed "three to four beers and cocktails regularly." (AR 437).

Dr. Lin found no evidence of tenderness to palpation on Plaintiff's wrists or back. (AR 438). The range of motion for Plaintiff's shoulders, elbows, hips, knees, and ankles was grossly normal bilaterally. (Id.). Dr. Lin therefore concluded that Plaintiff could "lift or carry 50 pounds occasionally and 25 pounds frequently," "stand or walk for 6 hours in an 8-hour workday," and "sit for 6 hours in an 8-hour workday."[3] (AR 439). Dr. Lin further opined that "[b]ending, stooping, kneeling, crouching and climbing stairs can be done occasionally." (Id.)

On October 10, 2006, Plaintiff visited Arrowhead Regional Medical Center for TMJ pain. (AR 198). Plaintiff experienced bilateral TMJ with some clicking, but no "gross disarticulation." (Id.). Her right TMJ was "slightly more lax than the left" and there was some "poor dentition." (Id.). Plaintiff also had

---

[3]   A Physical Residual Functional Capacity Assessment completed by Dr. M.A. Mazuryk also found that Plaintiff could lift or carry fifty pounds occasionally, twenty-five pounds frequently, stand or walk with normal breaks for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (AR 456).

1    imaging done for her TMJ on October 2, 2006, and Dr. David Lanum

2    found an "anterior TMJ dislocation with open-mouth view on the

3    right." (AR 211).

4

5        On October 25, 2006, Plaintiff had an MRI at Arrowhead

6    Medical Center. (AR 210).  Dr. Lanum concluded that Plaintiff

7    had mild degenerative changes of her spine, but no significant

8    central or neural foraminal stenosis. (Id.).

9

10       On December 22, 2006, Plaintiff visited the Arrowhead

11   Regional Medical Center for back pain. (AR 193).  Dr. Serra

12   Tranmer noted that Plaintiff was alert and oriented, had no acute

13   distress, and was most comfortable when "lying in the left

14   lateral recumbent position." (Id.).  Plaintiff experienced mild

15   distress when getting up and down from the exam table, but had

16   improved significantly in her range of motion since her last

17   visit. (Id.).

18

19       On January 5, 2007, Plaintiff visited the Arrowhead Regional

20   Medical Center for heart palpitations. (AR 192).  Dr. Tranmer

21   noted that Plaintiff was alert and oriented, and her heart had a

22   "regular rate and rhythm without murmurs." (Id.).

23

24       On February 13, 2007, Plaintiff visited the Arrowhead

25   Regional Medical Center for back pain. (AR 191).  Dr. Tranmer

26   described Plaintiff as having "good range of motion of her back"

27   and "able to reach and grab for things." (Id.).  Although

28   Plaintiff rotated her torso well without apparent distress, she

informed Dr. Tranmer that she was comfortable sitting only when "flexed with her upper body propped on her outstretched arms." (Id.).

On July 17, 2007 and November 16, 2007, Plaintiff received L4-L5 lumbar epidural steroid injections for her lower back pain at Arrowhead Regional Medical Center. (AR 481, 485-86). The injections helped reduce Plaintiff's pain. (AR 481).

On May 3, 2010, Dr. Marc Ricker evaluated Plaintiff's ability to engage in work-related activities. (AR 634-36). Dr. Ricker concluded that Plaintiff could lift and carry ten pounds on an occasional basis and less than ten pounds on a frequent basis. (AR 634). Dr. Ricker also indicated that Plaintiff could stand and walk for less than two hours during an eight-hour workday, and sit for less than two hours in an eight-hour workday. (Id.). Plaintiff could occasionally climb stairs, but could never stoop or bend, crouch, climb ladders, kneel, or crawl. (AR 635-36). Moreover, Plaintiff could be expected to miss work more than three times per month because of her medical conditions. (AR 636).

On November 23, 2010, Plaintiff received an internal medicine examination at Alto Medical Group. (AR 618-22). Dr. Sandra Eriks conducted the examination. (Id.). During the examination, Plaintiff denied using cigarettes, marijuana, or other drugs. (AR 619). Plaintiff informed Dr. Eriks that she drank "generally 14 to 24 ounces of vodka daily." (Id.). Dr.

1  Eriks noted Plaintiff's exaggerated hypersensitivity to touch in

2  all areas on her back, as she "screamed in pain when [Dr. Eriks]

3  moved her gown and brushed her back." (AR 620). Dr. Eriks found

4  Plaintiff's hypertension "under good control" and opined that her

5  back motion was "within normal limits on indirect testing." (AR

6  621-22). Dr. Eriks concluded that Plaintiff could "lift and

7  carry 100 pounds occasionally and 50 pounds frequently," "stand

8  and/or walk 6 hours out of an 8-hour workday," and "sit 6 hours

9  out of an 8-hour workday." (AR 622).

10

11      On November 23, 2010, Plaintiff underwent complete

12 psychiatric evaluation at Alto Medical Group. (AR 625-31). Dr.

13 Romualdo Rodriguez conducted the evaluation. (Id.). Plaintiff's

14 chief complaint was depression. (AR 625). Plaintiff admitted to

15 Dr. Rodriguez that she was addicted to alcohol and drank the

16 night before the evaluation. (AR 627). Plaintiff claimed that

17 she stopped using illegal drugs in 2004, stated that she goes to

18 Alcoholics and Narcotics Anonymous meetings, and admitted to

19 being an alcoholic and an addict. (Id.). Dr. Rodriguez noted

20 that Plaintiff could "drive her own car, run errands and

21 participate in household chores and self-care." (AR 630). He

22 opined that "[f]rom a psychiatric point of view, if [Plaintiff]

23 were properly treated for PTSD and ADHD and she abstain[ed] from

24 alcohol and continued to abstain from drugs, she could recover

25 from her symptoms within twelve months." (Id.). Dr. Rodriguez

26 found that Plaintiff could manage her finances and understand and

27 carry out simple and complex job instructions. (AR 630-31).

28

1    On May 17, 2011, Plaintiff received a lumbosacral spine x-
2  ray. (AR 1003-04). The x-ray revealed "minimal scoliosis of the
3  lumbar spine with minor degenerative changes." (AR 1003).
4  Moreover, the "vertebral body heights [were] relatively well
5  maintained." (Id.).

6

7    On February 13, 2012, Dr. Kenneth Westrate completed a
8  medical opinion regarding Plaintiff's physical ability to engage
9  in work-related activities. (AR 922-24). Dr. Westrate opined
10  that Plaintiff could lift and carry a maximum of less than ten
11  pounds occasionally and frequently, stand and walk less than two
12  hours in an eight-hour workday, and sit for less than two hours
13  in an eight-hour workday. (AR 922). He also noted that
14  Plaintiff could sit or stand for only ten minutes before having
15  to change position and that Plaintiff must walk around every
16  fifteen minutes for approximately five minutes. (AR 922-23).
17  Dr. Westrate attributed his findings to Plaintiff's "sever [sic]
18  lower back pain and neck pain." (AR 923). Dr. Westrate
19  concluded that because of this pain, Plaintiff would miss work
20  more than three times per month. (AR 924).

21

22    On April 4, 2012, Plaintiff had an MRI at Northern Arizona
23  Healthcare Medical Center. (AR 1023-25). Dr. Paul Hiette noted
24  that Plaintiff's lumbar spine was normally aligned and "signal
25  intensity of the bone marrow [was] normal." (AR 1023). At the
26  L4-5 level, Plaintiff had a "mild broad-based disc bulging with
27  lateralizing disc bulge extending into the right L4-5 foramen,"
28  but no significant foraminal compromise or nerve root

1  compression.   (AR 1025).

2

3                                    **IV.**

4              **THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

5

6       To   qualify   for   disability   benefits,   a   claimant   must

7  demonstrate   a   medically   determinable   physical   or   mental

8  impairment that prevents her from engaging in substantial gainful

9  activity[4] and that is expected to result in death or to last for

10  a  continuous  period  of  at  least  twelve  months.   <u>Reddick v.

11  Chater</u>,  157  F.3d  715,  721  (9th  Cir.  1998)  (citing  42  U.S.C.

12  §   423(d)(1)(A)).    The   impairment   must   render   the   claimant

13  incapable  of  performing  the  work  she  previously  performed  and

14  incapable of performing any other substantial gainful employment

15  that exists in the national economy.   <u>Tackett v. Apfel</u>, 180 F.3d

16  1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

17

18      To  decide  if  a  claimant  is  entitled  to  benefits,  an  ALJ

19  conducts a five-step inquiry.   20 C.F.R. §§ 404.1520, 416.920.

20  The steps are:

21

22       (1)  Is  the  claimant  presently  engaged  in  substantial

23            gainful  activity?   If  so,  the  claimant  is  found  not

24            disabled.   If not, proceed to step two.

25

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [4]    Substantial  gainful  activity  means  work  that  involves  doing
28  significant  and  productive  physical  or  mental  duties  and  is  done
    for pay or profit.  <u>See</u> 20 C.F.R. §§ 404.1510, 416.910.

                                    22

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted; 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in

23

the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded, at step one, that Plaintiff had not engaged in substantial gainful activity since April 11, 2006, the date she applied for SSI benefits.  (AR 756).  At step two, the ALJ found that Plaintiff had degenerative disc disease of the lumbar and cervical spine, TMJ, poorly controlled hypertension, and complaints of headaches and depression.  (Id.).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Id.).

1

2      At step four, the ALJ determined that Plaintiff had the RFC

3   to perform a range of light work, as defined in 20 CFR

4   § 416.967(b), except that Plaintiff could only occasionally

5   perform postural activities and would have to use a cane if

6   outside her immediate work area. (AR 758). The ALJ noted that

7   Plaintiff could not perform work requiring more than very

8   occasional talking (because of her TMJ), and she was also limited

9   to work in a non-public environment. (Id.). The ALJ considered

10  Plaintiff's alleged symptoms and subjective complaints, as well

11  as the objective medical evidence and other evidence in the

12  record, to make his determination. (Id.). Specifically, the ALJ

13  considered Plaintiff's adult function reports, Plaintiff's

14  headache questionnaire, the adult third party function reports,

15  Plaintiff's testimony, Steven Beckman's testimony, and the

16  objective medical evidence. (AR 758-63).

17

18      Finally, at step five, the ALJ found that Plaintiff could

19  not perform any past relevant work. (AR 764). The ALJ compared

20  Plaintiff's residual functional capacity with the physical and

21  mental demands of Plaintiff's past work and determined that

22  Plaintiff was unable to perform past relevant work as actually or

23  generally performed. (Id.). However, the ALJ determined that

24  considering Plaintiff's age, education, work experience and

25  residual function capacity, there are jobs existing in

26  significant numbers in the national economy that she could

27  perform. (Id.). Based on the testimony of a vocational expert,

28  the ALJ found that Plaintiff could perform the work of an

25

addresser, surveillance system monitor and garment sorter. (AR 765). Thus, Plaintiff was found "not disabled" within the meaning of the Social Security Act. (Id.).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not

26

substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).


**VII.**

**DISCUSSION**


Plaintiff contends that the ALJ erred for six reasons. First, Plaintiff argues that the ALJ did not properly assess her credibility. (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 11). Second, Plaintiff alleges that the ALJ failed to properly consider the testimony of her boyfriend, Steven Beckman. (<u>Id.</u> at 7). Third, Plaintiff claims that the ALJ improperly disregarded the opinion of treating physician, Dr. Marc Ricker. (<u>Id.</u> at 23). Fourth, Plaintiff argues that the ALJ improperly disregarded the opinion of treating physician, Dr. Kenneth Westrate. (<u>Id.</u> at 17). Fifth, Plaintiff contends that the ALJ did not properly consider the opinion of consultative examiner, Dr. Rodriguez. (<u>Id.</u> at 26). Finally, Plaintiff asserts that the ALJ failed to provide a complete and accurate assessment of Plaintiff's residual functional capacity. (<u>Id.</u> at 28). For the reasons discussed below, the Court disagrees with each of Plaintiff's proffered grounds for relief.


**A.    <u>The ALJ Properly Assessed Plaintiff's Credibility</u>**


The ALJ is responsible for determining a claimant's credibility. <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir.

27

1  2009) (citing Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.

2  1995)).   To determine whether a claimant's testimony regarding

3  her subjective pain or symptoms is credible, the ALJ must engage

4  in a two-part analysis.   Molina v. Astrue, 674 F.3d 1104, 1112

5  (9th Cir. 2012) (citing Vasquez, 572 F.3d at 591).

6

7      First, the ALJ must determine whether the claimant has

8  presented objective medical evidence of an impairment that could

9  reasonably be expected to produce the pain or symptoms alleged.

10 Id.   The claimant does not have to show that her impairment

11 "'could reasonably be expected to cause the severity of the

12 symptom[s] she has alleged; she need only show that it could

13 reasonably have caused some degree of the symptom[s].'" Vasquez,

14 572 F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028,

15 1036 (9th Cir. 2007)) (emphasis added).   Therefore, the ALJ

16 cannot reject a claimant's subjective pain testimony "'simply

17 because there is no showing that the impairment can reasonably

18 produce the degree of the symptom alleged.'"   Lingenfelter, 504

19 F.3d at 1036 (quoting Smolen, 80 F.3d at 1282).

20

21     Second, if the claimant satisfies the first part of the two-

22 step inquiry, and if there is no affirmative evidence of

23 malingering, "'the ALJ can reject the claimant's testimony about

24 the severity of her symptoms only by offering specific, clear and

25 convincing reasons for doing so.'"   Molina, 674 F.3d at 1112

26 (quoting Vasquez, 572 F.3d at 591).   If the ALJ believes a

27 plaintiff's testimony is not credible because her complaints are

28 inconsistent with clinical observations, the ALJ can satisfy the

28

clear and convincing threshold by specifying which complaints are contradicted by which clinical observations. <u>Regennitter v. Comm'r of Soc. Sec. Admin.</u>, 166 F.3d 1294, 1297-99 (9th Cir. 1999).   However, the ALJ must consider the objective medical evidence, together with other evidence, when evaluating a claimant's complaints about her pain and symptoms. <u>See</u> 20 C.F.R. § 404.1529(c)(2) (the Agency "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."); <u>see also Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997) (an ALJ may not discredit a claimant's subjective pain testimony solely on the ground that no objective medical evidence supports it).

The ALJ may consider many factors when evaluating a claimant's credibility, including "'(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.'" <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting <u>Smolen</u>, 80 F.3d at 1284); <u>see also Light</u>, 119 F.3d at 792 (in order to find a claimant not credible, "the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for

dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony."). If the ALJ's credibility finding is supported by substantial evidence in the record, "the Court may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); see also Rollins, F.3d at 857.

Here, the ALJ provided clear and convincing reasons based on substantial evidence for finding Plaintiff less than credible and rejecting her subjective pain and symptoms testimony. Under the first part of the analysis, the ALJ considered Plaintiff's adult function reports, headache questionnaire and testimony, as well as the objective medical evidence in the case. (AR 758-61). He then properly concluded that Plaintiff's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms." (AR 760). However, at step two of the analysis, he found claimant's statements concerning the intensity, persistence and limiting effects of her symptoms less than credible. (AR 760).

First, the ALJ noted that Plaintiff's allegations of severe pain were inconsistent with the "rather normal level of everyday activities" that she was able to complete, such as caring for her pets (i.e., feeding them and cleaning their litter boxes), grooming and bathing herself, driving, and going outside alone. (AR 759). It was proper for the ALJ to look at inconsistencies between Plaintiff's allegations and her proffered daily activities to assess her credibility. See Tommasetti, 533 F.3d

1   at 1039 (citing <u>Smolen</u>, 80 F.3d at 1284).

2

3       Second, the ALJ found that Plaintiff "exhibited no evidence

4   of pain or discomfort while testifying at the hearing." (AR

5   759).   An ALJ may rely on conflicts between a plaintiff's

6   testimony and her conduct at a hearing in assessing her

7   credibility.   <u>See</u> <u>Light</u>, 119 F.3d at 792.   Accordingly, the ALJ

8   did not err by giving "slight weight" to Plaintiff's conduct at

9   the hearing.  (AR 759).

10

11      Third, the ALJ cited additional conflicts between

12  Plaintiff's conduct and her testimony as evidence militating

13  against her credibility.   Plaintiff complained of constant TMJ

14  pain, yet "opened her mouth spontaneously to show her teeth" to

15  Dr. Eriks. (AR 761).   Plaintiff complained of severe back pain,

16  yet was able to "walk from [Dr. Eriks'] office to [her] car

17  without using a cane [and] without difficulty[.]" (<u>Id.</u>).

18  Plaintiff was purportedly unable to bend; however, Dr. Eriks

19  observed her "lean over and remove her socks and shoes with no

20  difficulty[.]" (<u>Id.</u>).   The ALJ considered this conduct direct

21  evidence contradicting Plaintiff's subjective testimony regarding

22  the severity of her pain and the extent of her physical

23  limitations.

24

25      Fourth, the ALJ cited specific clinical observations in the

26  record that contradicted Plaintiff's allegations about the

27  severity of her pain. (AR 760-63).   On November 24, 2004,

28  Plaintiff's hypertension and depression were noted as improved,

and June 2006 x-rays of her hips, lumbar spine, and cervical were normal. (AR 760). In June 2006, Dr. Lin found Plaintiff capable of lifting and/or carrying up to fifty pounds occasionally and twenty five pounds frequently, and standing/walking for six hours in an eight-hour workday. (Id.). Treatment notes from August 2010 indicated that Plaintiff's headaches had improved significantly, and in October 2010, Plaintiff's lumbar disc disease was described as severe but responding well to back injections. (AR 761). On November 23, 2010, Dr. Eriks conducted a full consultative exam of Plaintiff and concluded that she could lift and carry up to one hundred pounds occasionally and fifty pounds frequently, and stand/walk for six hours in an eight-hour workday. (Id.).

With respect to Plaintiff's alleged mental impairments, Dr. Linda Smith performed a consultative evaluation of Plaintiff on July 14, 2006 and concluded that Plaintiff was "no more than mildly impaired with most mental functions." (AR 762). In November 2010, Dr. Rodriguez examined Plaintiff and diagnosed her with PTSD, polysubstance dependence, in full remission, and ADHD. (Id.). Dr. Rodriguez opined that Plaintiff was only slightly impaired in all her mental functions, except that she was moderately limited in her ability to maintain concentration, attention, persistence and pace. (Id.). However, Plaintiff was coherent and able to follow her conversation with the doctor. (Id.). Plaintiff informed Dr. Rodriguez that she could drive, run errands, do household chores, dress and bathe herself, and comprehend financial matters. (Id.).

1   To the extent the ALJ relied on these objective clinical
2   findings, as well as the other evidence in the record bearing on
3   Plaintiff's credibility, he had clear and convincing reasons
4   based on substantial evidence for discounting Plaintiff's
5   subjective testimony. See Rollins, 261 F.3d at 859; Tommasetti,
6   533 F.3d 1035 at 1039 (citing Smolen, 80 F.3d at 1284); Light,
7   119 F.3d at 792. Accordingly, it is not the province of this
8   Court to second-guess the ALJ's credibility determination.
9   Thomas, 278 F.3d at 959.

10

11   **B.   The ALJ Properly Rejected Steven Beckman's Testimony**

12

13   Plaintiff argues that the ALJ failed to properly assess the
14   testimony and statements of Plaintiff's boyfriend, lay witness
15   Steven Beckman. (MSPC at 7). When determining a claimant's
16   disability, an ALJ "must consider lay witness testimony
17   concerning a claimant's ability to work." Stout v. Comm'r of
18   Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). Indeed,
19   "'lay testimony as to a claimant's symptoms or how an impairment
20   affects ability to work is competent evidence . . . and therefore
21   cannot be disregarded without comment.'" Id. (quoting Nguyen v.
22   Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). Thus, disregarding
23   the testimony of a plaintiff's friends or family members without
24   adequate justification violates 20 C.F.R. § 404.1513(e)(2)(1991).
25   Smolen, 80 F.3d at 1288. Accordingly, if an ALJ wishes to
26   disregard the testimony of a lay witness, he must provide reasons
27   that are germane to that witness. Dodrill v. Shalala, 12 F.3d
28   915, 919 (9th Cir. 1993).

On February 7, 2012, the Appeals Council rejected ALJ Pease's credibility finding. According to the Appeals Council, the ALJ's proferred reasons for rejecting Mr. Beckman's testimony – namely, that Mr. Beckman was "financially motivated and . . . was not a medical professional or otherwise qualified to diagnose severe impairments or to assess their effect on the Plaintiff's ability to perform work-related activities[]" – were not sufficiently "germane" to the witness. (AR 852). On August 3, 2012, ALJ Pease issued another decision denying Plaintiff SSI benefits in which he again found Mr. Beckman's testimony and statements wanting in credibility. (AR 759-60). ALJ Pease found "the claimant's friend's allegations concerning the intensity, persistence and limiting effects of the claimant's symptoms less than fully credible[]" for three reasons: (1) Mr. Beckman was not a medical professional; (2) his testimony was biased in light of his emotional and financial interest in Plaintiff receiving SSI benefits; and (3) his statements were unsupported by the clinical or diagnostic medical evidence in the record. (Id.).

Although the first two reasons that the ALJ provided in his most recent decision were identical to those the Appeals Council rejected as inadequate, the third reason was new. An ALJ may not reject lay testimony about a plaintiff's pain solely because the testimony lacks objective medical support. See Smolen, 80 F.3d at 1288-89 (ALJ's rejection of the lay witness testimony was improper where plaintiff's medical records were sparse and did not provide adequate documentation of the symptoms the witnesses alleged they observed). Here, however, Plaintiff's medical

34

1    records directly contradicted Mr. Beckman's testimony concerning

2    the severity and intensity of Plaintiff's symptoms. (AR 760).

3

4        Mr. Beckman indicated in his May 14, 2006 third party

5    function report that that Plaintiff's pain severely limited her

6    ability to lift, squat, bend, stand, reach, walk, sit, kneel, and

7    climb stairs, the objective medical evidence told a different

8    story.  However, on July 14, 2006, just two months after Mr.

9    Beckman completed this report, Dr. Lin concluded that Plaintiff

10   could "lift or carry 50 pounds occasionally and 25 pounds

11   frequently," "stand or walk for 6 hours in an 8-hour workday,"

12   and "sit for 6 hours in an 8-hour workday." (AR 439).  In April

13   2007, Dr. M.A. Mazuryk determined that Plaintiff was capable of

14   far greater physical activity and exertion than that described by

15   Mr. Beckman. (AR 456).  Furthermore, as discussed above, the

16   objective medical evidence in the record contradicted Plaintiff's

17   own testimony about the severity of her pain and resulting

18   physical limitations.  Because Mr. Beckman's testimony and other

19   statements reiterated the same limitations and symptoms that

20   Plaintiff advanced during her testimony, the ALJ was on solid

21   footing when he deemed Mr. Beckman's statements less than

22   credible.

23

24       Finally, even if the ALJ improperly discredited Mr.

25   Beckman's testimony, which he did not, the failure to properly

26   consider the testimony of a lay witness is harmless error if the

27   testimony is "inconsequential to the ultimate nondisability

28   determination." See, e.g., Stout, 454 F.3d at 1055; Molina, 674

1 F.3d at 1122 (where lay testimony "did not describe any

2 limitations beyond those [plaintiff] herself described, which the

3 ALJ discussed at length and [properly] rejected . . . the ALJ's

4 failure to give specific witness-by-witness reasons for rejecting

5 the lay testimony did not alter the ultimate nondisability

6 determination.   Accordingly, the ALJ's error was harmless").

7 Here, Mr. Beckman did not identify any limitations beyond those

8 that Plaintiff set forth in her testimony and which the ALJ, as

9 discussed above, properly rejected.   Therefore, even if the ALJ's

10 reasons for rejecting Mr. Beckman's testimony were inadequate,

11 this error was harmless.   Remand is not required on this ground.

12

13 **C.   The ALJ Properly Considered And Rejected The Opinions Of**

14 **Drs. Marc Ricker And Kenneth Westrate**

15

16 Plaintiff argues that the ALJ failed to properly consider

17 the medical opinions of treating physicians Dr. Marc Ricker and

18 Dr. Kenneth Westrate.   (MSPC at 17-26).   On May 3, 2010, Dr.

19 Ricker completed a "Medical Opinion Re: Ability to do Work-

20 Related Activities (Physical)" on behalf of Plaintiff.   (AR 634-

21 36).   Dr. Ricker opined that Plaintiff could carry ten pounds

22 occasionally and less than ten pounds frequently; sit, stand and

23 walk less than two hours in an eight-hour workday; and needed to

24 alternate positions every twenty minutes.   (AR 634-35).

25 Plaintiff also had limited ability to reach above her shoulders,

26 push and pull, and would have to lie down at unpredictable

27 intervals twice per workday.   (AR 635).   Dr. Ricker anticipated

28 that Plaintiff would miss work more than three times per month

1    due to her conditions.  (Id.).  Dr. Ricker attributed Plaintiff's

2    limitations to "severe" back spasms and "antalgic gait[.]"  (AR

3    636).

4

5        On February 13, 2012, Dr. Westrate completed a "Medical

6    Opinion Re: Ability to do Work-Related Activities (Physical)" on

7    behalf of Plaintiff.  (AR 922-24).  Dr. Westrate opined that

8    Plaintiff could carry less than ten pounds frequently; stand and

9    walk for less than two hours in an eight-hour workday; needed to

10   alternate between sitting, standing and walking every ten to

11   fifteen minutes; and needed to lie down at unpredictable

12   intervals at least once during the workday.  (AR 922-23).

13   Plaintiff was also limited in her ability to reach overhead,

14   perform gross and fine manipulation, feel, push and pull.  (AR

15   923).  Due to her condition, Plaintiff would have to miss more

16   than three days of work per month.  (AR 924).  Dr. Westrate

17   attributed these limitations to Plaintiff's "severe" back and

18   neck pain.  (AR 923).

19

20       The opinions of treating physicians are generally afforded

21   more weight than the opinions of nontreating physicians because

22   treating physicians are employed to cure and have a greater

23   opportunity to know and observe the claimant.  Smolen, 80 F.3d at

24   1285.  If a treating physician's opinion is well supported by

25   medically acceptable clinical and laboratory diagnostic

26   techniques and is not inconsistent with the other substantial

27   evidence in the record, it should be given controlling weight.

28   20 C.F.R. § 404.1527(c)(2).  If a treating physician's opinion is

not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. Id. § 404.1527(c)(2)-(6). When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Carmickle, 533 F.3d at 1164 (quoting Lester, 81 F.3d at 830-31). When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id.

Here, the ALJ provided specific and legitimate reasons for discounting the opinions of Drs. Ricker and Westrate. Whereas Drs. Ricker and Westrate concluded that Plaintiff suffered severe physical limitations due to her back pain, examining physicians Drs. Lin and Eriks found that Plaintiff was capable of far greater physical exertion. In July 2006, Dr. Lin diagnosed Plaintiff with lower back pain due to degenerative disc disease of the lumbosacral spine, hypertension, carpal tunnel syndrome in the left hand, left-sided migraine headaches and a history of mental illness. (AR 435-41). He found that Plaintiff could nevertheless lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, and stand, sit and walk for up to six hours in an eight-hour workday. (AR 439). Over four years later, Dr. Eriks performed a complete examination of Plaintiff and diagnosed Plaintiff with hypertension currently under good control on medications, history of low back pain and history of

1   TMJ.  (AR 618-22).  Based on the examination, Dr. Eriks concluded

2   that Plaintiff could lift up to one hundred pounds occasionally

3   and fifty pounds frequently, and stand, walk and sit for up to

4   six hours in an eight-hour workday.  (AR 622).  Thus, the medical

5   opinions of Drs. Lin and Eriks directly contradicted those of

6   Drs. Ricker and Westrate.  Accordingly, the ALJ only needed to

7   set forth specific and legitimate reasons for discounting the

8   medical opinions of Drs. Ricker and Westrate.  See Bray v. Comm'r

9   of Soc. Sec. Admin., 554 F.3d 1219, 1228 n.8 (9th Cir. 2009).

10  Here, the ALJ met this standard.

11

12      First, the ALJ explained that the opinions of Drs. Ricker

13  and Westrate were not supported by the objective medical evidence

14  in the record.  (AR 763).  As discussed above, Drs. Lin and Eriks

15  concluded that Plaintiff was not nearly as physically limited as

16  Drs. Ricker and Westrate suggested.  Furthermore, Dr. Eriks

17  observed Plaintiff lean over and remove her socks and shoes

18  without difficulty, walk from her car to the doctor's office

19  without a cane and without difficulty, and spontaneously open her

20  mouth to show her teeth.  (AR 761).  The ALJ found this conduct

21  directly at odds with a restrictive view of Plaintiff's physical

22  capabilities.  Moreover, treatment notes from August 2010

23  indicated that Plaintiff was responding well to treatment for TMJ

24  and back pain, and that her migraines had decreased by fifty

25  percent.  (Id.).  X-rays of Plaintiff's lumbar spine from May

26  2011 showed minimal signs of scoliosis and only some loss of disc

27  space of the L-5-s1 level.  (AR 1003).  Finally, an April 2012

28  MRI of Plaintiff's lumbar spine showed degenerative disc

desiccation that was relatively mild for age from T11-12 through L4-5 and of moderate severity at L5-S1; no congenital canal stenosis; age-compatible mild to moderate degenerative facet athropathy; active inflammation at L4-5 and L5-S1; developing instability at L5-S1; and mild broad-based disc bulging. (AR 1024-25). Thus, at worst, imaging of Plaintiff's lumbar spine from 2011 and 2012 revealed moderate and mild degeneration that was generally consistent with Plaintiff's age.

Second, the ALJ explained that Plaintiff's description of her daily activities contradicted the opinions of Drs. Ricker and Westrate. (AR 763). Dr. Ricker concluded that Plaintiff could "never" stoop (bend) or crouch. (AR 635). She also could not sit for more than twenty minutes at a time. (AR 634). Dr. Westrate agreed that Plaintiff could never stoop or crouch, and found that she could not sit for more than ten minutes at a time. (AR 923). However, Plaintiff admitted that she was able to drive and care for her pets, two activities that routinely require physical exertion beyond the level of activity that Drs. Ricker and Westrate found Plaintiff capable of performing.

Finally, the ALJ noted that opinions on issues reserved to the Commissioner are neither entitled to controlling weight nor binding on the ALJ. (AR 763). The ALJ is correct "that a treating physician's statement on an issue reserved to the Commissioner, such as the determination of a claimant's ultimate disability, is not binding on the ALJ or entitled to special weight." Dominguez v. Colvin, 927 F. Supp. 2d 846, 861 (C.D.

1  Cal. 2013); see also 20 C.F.R. § 404.1527(d)(1) ("A statement by
2  a medical source that you are 'disabled' or 'unable to work' does
3  not mean that we will determine that you are disabled."). Thus,
4  the opinions of Drs. Ricker and Westrate were not binding on the
5  ALJ or entitled to heightened deference to the extent they
6  implied that Plaintiff was disabled or limited to a particular
7  residual capacity function. See SSR 96-5P, 1996 WL 374183, at
8  *4-5.

9

10      However, the extent and severity of a patient's physical
11  limitations are not administrative assessments reserved to the
12  ALJ. Rather, pursuant to 20 C.F.R. §§ 404.1527(a) and
13  416.927(a), medical opinions include statements reflecting
14  judgments about the nature and severity of a patient's
15  impairments, including symptoms, diagnosis and prognosis, what a
16  patient can still do despite impairments, and any physical or
17  mental restrictions. See SSR, 1996 WL 374183, at *2. Because
18  the disability reports prepared by Drs. Ricker and Westrate
19  described the nature and extent of Plaintiff's physical
20  restrictions, they were entitled to the deference that treating
21  sources' opinions generally command.

22

23      Nevertheless, as discussed above, these opinions were
24  contradicted by the findings of Plaintiff's other doctors. Thus,
25  the ALJ was only required to set forth specific and legitimate
26  reasons for rejecting the opinions of Drs. Ricker and Westrate.
27  The ALJ satisfied this requirement by citing (1) objective
28  medical evidence that Plaintiff did not suffer severe physical

1    limitations, and (2) Plaintiff's daily activities, which required

2    Plaintiff to physically exert herself in ways that Drs. Ricker

3    and Westrate claimed impossible.  Remand is not required on this

4    ground.

5

6    **D.    The ALJ Properly Considered The Opinion Of Consultative**

7    **Examiner, Dr. Romualdo Rodriguez**

8

9        Plaintiff argues that the ALJ failed to properly consider

10   the medical opinion of consultative examiner, Dr. Romualdo

11   Rodriguez.  (MSPC at 26).  Specifically, Plaintiff argues that

12   the ALJ failed to "address the moderate limitation in Plaintiff's

13   ability to maintain concentration and attention, persistence and

14   pace" when he concluded that Plaintiff's mental limitation in her

15   RFC is "limited to non-public environment" work.  (MSPC 26).

16

17       On November 23, 2010, Dr. Rodriguez conducted a complete

18   psychiatric evaluation of Plaintiff.  (AR 625-31).  Dr. Rodriguez

19   noted that Plaintiff could "drive her own car, run errands and

20   participate in household chores and self-care."  (AR 630).

21   Plaintiff could also manage her finances and understand, remember

22   and carry out simple and complex job instructions.  (AR 630-31).

23   Plaintiff was, however, "[m]oderately limited in her ability to

24   maintain concentration and attention, persistence and pace."  (AR

25   630).

26

27       The ALJ considered Dr. Rodriguez's opinion together with the

28   other evidence in the record and concluded that Plaintiff could

"perform a range of light work," but was "limited to non-public environment" work.  (AR 758).  This determination was not inconsistent with Dr. Rodriguez's opinion regarding Plaintiff's mental limitations.  Although Dr. Rodriguez indicated that Plaintiff was moderately limited in her ability to maintain concentration, attention, persistence and pace, he also opined that Plaintiff could understand, remember, and carry out both simple and complex job instructions.  (AR 630-31) (emphasis added).  The ALJ did not fail to address the moderate limitation that Dr. Rodriguez indicated in his report, and the ALJ otherwise properly considered the opinion of Dr. Rodriguez in reaching his conclusion.

Moreover, the ALJ observed Plaintiff during the most recent administrative hearing and found that Plaintiff "did not demonstrate or manifest any difficulty concentrating during the hearing" and she "appeared to process the questions without difficulty." (AR 759).  Plaintiff's conduct at her hearing was competent evidence of her mental health and limitations, and the ALJ properly considered this evidence in weighing Dr. Rodriguez's opinion and reaching a conclusion regarding Plaintiff's condition.  See, e.g., Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999); Drouin v. Sullivan, 966 F.2d 1255, 1259 (9th Cir. 1992); see also SSR 96-7p ("[The ALJ] may also consider his or her own recorded observations of the individual . . .]."

\\

\\

\\

43

**E.**   **The ALJ Provided A Complete And Accurate Assessment Of Plaintiff's Residual Functional Capacity**

Plaintiff argues that the ALJ failed to properly assess her residual functional capacity. (MSPC 28). Specifically, Plaintiff argues that the ALJ's RFC determination "should be deemed unsupported by substantial evidence in the record and legally insufficient" for the three reasons: (1) the ALJ rejected Dr. Westrate's and Dr. Ricker's opinions "without setting forth specific and legitimate evidence to support his conclusion"; (2) the ALJ failed to include Dr. Rodriguez's opinion that "Plaintiff had moderate limitations in her ability to maintain concentration and attention, persistence and pace"; and (3) the ALJ failed to "take into account Plaintiff's subjective symptoms in assessing her RFC when he improperly assessed Plaintiff's credibility and the lay witness testimony." (MSPC 28-29).

The Court finds that the ALJ's RFC assessment was supported by substantial evidence. See Massanari, 257 F.3d at 1035. As discussed above, the Court disagrees with each argument underlying Plaintiff's attack on the ALJ's RFC determination. The ALJ properly analyzed the objective medical evidence, gave proper weight to each physician's opinion, and considered the testimony of Plaintiff and lay witness Steven Beckman. Thus, the ALJ considered all of Plaintiff's symptoms "and the extent to which these symptoms c[ould] reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" (AR 758).

44

1    The ALJ concluded, following VE testimony, that Plaintiff
2 had the residual functional capacity to perform a range of light
3 work, except that Plaintiff could only occasionally perform
4 postural activities and had to use a cane if required to move
5 outside her immediate work area.  (AR 758-63).  He also found
6 that Plaintiff could only work in a non-public environment.  This
7 conclusion was the product of thoughtful and thorough
8 consideration of the record in its entirety.  Accordingly,
9 Plaintiff's argument is without merit.

10

11                              **VIII.**

12                           **CONCLUSION**

13

14    For the foregoing reasons, IT IS ORDERED that Judgment be
15 entered AFFIRMING the decision of the Commissioner.  The Clerk of
16 the Court shall serve copies of this Order and the Judgment on
17 counsel for both parties.

18

19

20 DATED:  January 13, 2014

21                              /S/
                         SUZANNE H. SEGAL
22                       UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

                              45